IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DERRELL LAMONT GILCHRIST                :

                                        :

        v.                              :   Civil Action No. DKC 08-1218
                                            Criminal No. DKC 02-0245
                                        :

UNITED STATES OF AMERICA                :

                                        :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this case is a motion filed by *pro se* Petitioner Derrell Lamont Gilchrist to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. (ECF No. 76). Also pending are Petitioner's two motions to amend his § 2255 motion (ECF Nos. 79, 109); three motions for discovery (ECF Nos. 76, 93, 103), and a motion for appointment of counsel (ECF No. 76).[1] The relevant issues have been briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, Petitioner's motions will be denied.[2]

---

[1] Petitioner filed a motion for discovery and for appointment of counsel along with his § 2255 motion. All three documents, as well as a single memorandum in support, were filed under one docket entry.

[2] Petitioner has also moved for leave to proceed *in forma pauperis*. (ECF No. 77). Because a filing fee is not required for a § 2255 petition, this motion will be denied as moot. The court will also deny three motions to supplement the record with pertinent case law (ECF Nos. 95, 97, 111) that are both unauthorized and unnecessary.

I.   **Background**

Petitioner was charged by a twelve-count superseding indictment with four armed bank robberies, in violation of 18 U.S.C. § 2113(a) and (d); carjacking, in violation of 18 U.S.C. § 2119; four counts of use of a handgun in the commission of the bank robberies and the carjacking, in violation of 18 U.S.C. § 924(c); conspiracy to engage in two of the bank robberies and the carjacking, in violation of 18 U.S.C. § 371; and possessing a firearm after a felony conviction, in violation of 18 U.S.C. § 955(g).  (ECF No. 4).  Following the denial of his pre-trial motions – including motions to sever and to suppress identification evidence – the case proceeded to a jury trial on January 7, 2003.

   A.   **Factual Background**

The evidence adduced at trial was as follows.  On March 15, 2001, at approximately 2:00 p.m., Robin Harris, the branch manager of Columbia Bank in Greenbelt, Maryland, observed from her office window a "heavyset" black male, wearing a gray sweatshirt and blue jeans, pacing on the sidewalk in front of the bank.  (T. 1/7/03, at 27-28).  Shortly thereafter, Ms. Harris walked to the break room and heard a "loud commotion" coming from the customer service area.  (*Id.* at 28).  She learned from a co-worker that a robbery was in progress. Another bank employee was in the lobby when a "[h]eavyset guy"

2

with "a full face ski mask [and a] gray sweatshirt and jeans" entered the bank and started "waving a gun, saying give me the money, no dye packs, get down on the floor." (T. 1/8/03, at 77-79).[3]   A customer in the teller line similarly described the robber as a "stocky" man wearing a "gray . . . sweatshirt, dark jeans, [and] boots" who "point[ed] the gun at the teller, saying give him the money, no dye packs." (*Id*. at 105-06).   After collecting $10,809 from the tellers (*id*. at 130), the man stated, "thank you, Merry Christmas," as he exited the bank (*id*. at 106).

Ms. Harris and one other witness watched from separate windows as the robber ran to a black Jeep Cherokee and drove away, but neither witness was able to read the license plate. (T. 1/7/03, at 29; 1/8/03, at 88).   Ms. Harris recognized the man she saw running from the bank after the robbery as "the same guy who was walking across the sidewalk that [she] had seen earlier." (T. 1/7/03, at 29).

On April 25, 2001, the teller coordinator at a Bank of America branch in Mitchellville, Maryland, was assisting a customer when she noticed a "guy come in the door on the left-hand side . . . [and] put [a] ski mask on." (T. 1/8/03, at 175-

---

[3] The witnesses to this and each of the other bank robberies were shown photographs from surveillance cameras taken during the robberies that generally corroborated their accounts and descriptions.

76).   The man pointed a "flat silver plated gun" as he "told everybody to get down on the floor" and "started to rob the teller line," instructing the tellers, "no dye pack[s]."   (*Id.* at 177).   The robber was a black male with a "stocky" build, approximately 5'5", and wearing a dark jacket and a mask that covered his face completely.   (*Id.* at 195, 198-99).   As the man exited the bank, with approximately $12,029 from the teller windows (*id.* at 232), he stated, "have a blessed day" (*id.* at 178) and "merry F-ing Christmas" (*id.* at 209).

One of two other witnesses who provided accounts of the Bank of America robbery saw the perpetrator "run around the building and go in the direction of the woods" as he left.   (*Id.* at 210).   A construction worker at a job site behind the bank saw a "stocky" man wearing a dark leather jacket and a "doo-rag" partially covering his face running from the bank along the edge of a wooded area.   (*Id.* at 240-41).   At one point, the man got "caught in some briars" and a black item of clothing "came off . . . his head or around his neck."   (*Id.* at 248).   An FBI agent arrived later, spoke to the construction worker, and recovered a black skull cap from the wooded area next to the bank.   (*Id.* at 263).

On June 15, 2001, at around 3:30 p.m., Matilda Burgos was seated in her car in a parking lot outside a SunTrust Bank branch in Landover Hills, Maryland, when she observed two black

4

men walk by.   The face of one of the men was "covered with a mask."   (T. 1/9/03, at 110).   As the two men approached the bank, "one pull[ed] a weapon" and Ms. Burgos immediately called police.   (*Id.*).   She watched the men for approximately twenty seconds as they entered the bank.   The man wearing the mask was taller and thinner than the other man; the unmasked man, identified in court by Ms. Burgos as Petitioner, had "bushy" hair and wore baggy clothing.   (*Id.* at 112).

Multiple witnesses testified that the two men entered the bank and "announced that there was a robbery."   (*Id.* at 150). The larger, shorter man "walked up to a window and demanded that the teller give the money . . . [and] go to the next window and also get money out."   (*Id.*).   The taller, thinner man, carrying a "silver gun," approached a customer who was seated at a desk with a bank employee, "snatched" her car keys from the desk, and stated, "we have a getaway car.  Let's go."   (*Id.* at 166).   The two men left the bank with approximately $10,742 (*id.* at 188-89) and fled "at a high rate of speed" in a 1996 red minivan belonging to the bank customer (*id.* at 167).   A detective with the Prince George's County Police Department found the red minivan abandoned at a nearby location at approximately 11:00 p.m. that night.   (*Id.* at 180-81).

On June 21, 2001, the head teller at Potomac Valley Bank in Bethesda, Maryland, was working near the entrance of the bank

when he saw "two gentlemen come in with masks on." (*Id*. at 205). One of the men was "tall" and the other was "short, heavyset." (*Id*.). The men ordered the bank's customers and employees to get "down on the floor" and "proceeded to go to the tellers and tell them to give them the money." (*Id*. at 206). The taller of the two men pointed a gun at a security officer, threatening to shoot, while the shorter man collected money from the teller windows, "yelling give me more, give me some more money." (*Id*. at 207). The men robbed the bank of approximately $7,000 (T. 1/10/03, at 19) and were seen leaving in a "canary yellow" Toyota Camry bearing Maryland license plate number GMR297 or GMY297 (T. 1/9/03, at 208, 223, 226).[4]

On July 13, 2001, at approximately 9:40 a.m., Officer Raymond Redden, an undercover officer with the Prince George's County Police Department, exited a non-descript office building that housed the police department's Narcotics Enforcement Division and walked to his unmarked police car – a black, four-door Mercury Grand Marquis. (T. 1/10/03, at 31-33). When he reached the car, he saw "two black individuals crawling out of

---

[4] Another witness previously testified that her tan-colored 1987 Toyota Camry, with Maryland license plate number GMY092, was stolen from a shopping center in Landover, Maryland, on June 18, 2001. (T. 1/9/03, at 195-99). The government's theory was that Petitioner stole this car for use in the robbery. The teller at Potomac Valley Bank was emphatic, however, that the getaway car he saw was a different color and had a different tag number. The jury ultimately acquitted Petitioner of the Potomac Valley Bank robbery and the associated handgun charge.

the woods" nearby. (*Id*. at 35). The larger of the two men, identified in court by Officer Redden as Petitioner, "pulled a black [semiautomatic] handgun out of his waistband" and "placed [a bandanna] up over his nose and mouth." (*Id*. at 35-36). The man pushed the gun into Officer Redden's side and said "we're going to rob you. Give us your keys." (*Id*. at 36). Officer Redden tossed his keys on the front seat through the open driver's side door, at which point Petitioner told him, "we're going to kill you. Lay on the ground." (*Id*. at 38). When the officer refused, Petitioner threatened to "cap" him three times. (*Id*. at 39). After the third threat, Officer Redden grabbed the top of the gun and the two men began to struggle for possession. During the struggle, Petitioner pulled the trigger, firing one round into the air, and repeatedly urged the second man, who was holding a silver semiautomatic handgun, to "kill" Officer Redden. (*Id*. at 41). When Petitioner and the second man knocked Officer Redden to the ground; the officer jumped to his feet and sprinted toward the locked entrance to the Narcotics Enforcement Division. As he waited for officers inside to open the door, Officer Redden saw Petitioner driving his vehicle, with the second man seated in the backseat, as it sped away.

Police immediately scoured the area. Officer Haywood North, driving an unmarked police car with Detective Gutierrez seated in the passenger seat, was idling at a red light nearby

when he observed what appeared to be Officer Redden's vehicle pass through the intersection.   He saw a black male with bushy hair driving and a second man seated in the backseat.   Upon verifying the tag number, he pursued, at which point Officer Redden's vehicle "started to speed up . . . very much."  (*Id.* at 219).   A high-speed chase ensued.   It ended when Officer North crashed his vehicle as he followed the stolen car through a red light.   Detective Gutierrez was injured in the accident and had to be transported to a hospital.

Three witnesses residing on nearby Allendale Terrace in Landover testified that at around 10:00 a.m. on July 13 they observed a vehicle drive down their cul-de-sac at a high rate of speed, jump the curb, and come to a sudden stop, at which point two black men exited and began running.   One of the men "was sort of short . . . and sort of stocky" and appeared to drop a "pistol," which he stopped to recover, before continuing to run. (T. 1/14/03, at 23-24).   One of the witnesses called police. Officer Wendell Brantley arrived approximately three minutes later, finding Officer Redden's police car "partially parked on the sidewalk and [] in a gentleman's yard."   (T. 1/10/03, at 235).   Upon speaking to witnesses, Officer Brantley broadcast a description of the men observed running from the scene.

At around 11:30 a.m. on the same date – *i.e.*, approximately one and one-half hours after the two men were seen running from

8

Officer Redden's vehicle in Landover – an armed robbery occurred at a Chevy Chase Bank branch on Columbia Pike in Arlington, Virginia.  Gwendolyn Day was entering the bank when she observed "two guys . . . running across the street."  (T. 1/14/03, at 271).  One of the men was "tall with a white shirt and either black jeans or blue jeans"; the other was a "heavyset, fat guy . . . [wearing] a black shirt."  (*Id.*).  Minutes later, she was inside when the same two men entered the bank.  "[T]he heavyset guy[] came in and said this is a holdup . . . [and] went down in his pants and pulled this silver gun."  (*Id.* at 273).  Ms. Day identified Petitioner, in court, as "the guy I [saw] coming across the street" and "the one that was standing there with the gun in his hand."  (*Id.* at 274-75).  The robbers forced the customers to lie on the ground and the "heavy guy" approached the tellers, saying "give us the money, all the money. . . . [I]f you don't give me all the money, then I'm going to start executing [the customers]."  (*Id.* at 273).  The faces of both men were covered by bandannas.[5]  As they exited, with approximately $21,000 (T. 1/15/03, at 108), a witness outside saw "two men running out of the bank," one of whom was holding a "bag and a gun" (*id.* at 92).  The man holding the bag and gun

---

[5]  Ms. Day's account was substantially corroborated by two other witnesses.  The Chevy Chase robbery was not charged in the superseding indictment – indeed, it occurred in Virginia – but was nevertheless relevant to the investigation of the Maryland bank robberies and the carjacking.

was "heavyset" and "short"; the "second one was taller." (*Id.* at 94). The two men ran behind a nearby laundromat.

At around that time, David Jones was driving on Columbia Pike when a gray, older model Jeep Cherokee turned out of a parking lot and "almost made [him] have an accident." (*Id.* at 128).[6] Mr. Jones was angry and pulled alongside the Cherokee to "get the driver's attention." (*Id.* at 129). When he was initially unsuccessful in doing so, he "decided . . . to follow" the Cherokee. (*Id.*). For approximately fifteen minutes, Mr. Jones repeatedly pulled alongside the car, blaring his horn, as it "[d]ipp[ed] in and out of traffic" at a high rate of speed. (*Id.* at 130). The driver of the Cherokee was a black male and had a "box head"; there was a passenger in the backseat. (*Id.* at 134). The Cherokee "didn't have a front grill, . . . had tape on the driver's side holding one of the lights together[,] . . . [and had] a tag in the front window." (*Id.* at 135). Mr. Jones discontinued his pursuit when the Cherokee exited Columbia Pike on the outskirts of the District of Columbia. He wrote down the license plate number – Maryland tag number 385452 – and

---

[6] Frankie Jackson, Petitioner's stepfather, previously testified that Petitioner owned a Jeep Cherokee that was originally black, but was painted gray in July 2001. (T. 1/14/03, at 147-49). Petitioner also owned a "brown . . . Chevrolet Caprice." (*Id.* at 148). Mr. Jackson further testified that, in July 2001, Petitioner lived with him and Petitioner's mother at 9007 Lake Largo Drive in Largo, Maryland. (*Id.* at 147).

returned to the location where he first encountered the Cherokee. Upon finding police at the Chevy Chase Bank, he "gave them the tag number and a description of the vehicle." (*Id.* at 132).

Detective Viet Nguyen of the Arlington County Police Department ran the tag number provided by Mr. Jones, learning that the Cherokee was registered to Petitioner. (T. 1/14/03, at 259-60).[7] At approximately 2:00 p.m. on the same date, FBI agents arrived at Petitioner's home in Largo. They met with Petitioner's stepfather and mother, Bertha Yvonne Mason Jackson, who advised that Petitioner was not home. While they were there, Ms. Jackson received a phone call from Petitioner and told him the FBI wanted to speak with him about "[t]he Jeep Cherokee . . . [being] involved in a bank robbery." (T. 1/15/03, at 278-79).[8]

At some point after 7:30 p.m. on July 15, a patrol officer with the United States Department of the Treasury, Bureau of Engraving and Printing, observed the Cherokee parked in the

---

[7] An investigator with the Maryland Motor Vehicle Administration previously testified that a 1996 black Jeep Cherokee with Maryland tag number 385452 was registered to Petitioner from January 27, 2000, to December 18, 2002. (T. 1/8/03, at 154-59).

[8] Ms. Jackson called Petitioner's trial counsel, Douglas J. Wood, who directed the FBI agents to leave the home. (T. 1/15/03, at 293-94). The agents "muttered something and left." (*Id.* at 294).

District of Columbia "in an area where vehicles do not normally sit." (*Id.* at 192). He saw that "there was no front license plate on the vehicle," that it had "some grill damage[]," and that "the headlight on the driver's side was taped in." (*Id.* at 195). When the car was parked in the same location the next evening, he "ran the license plates off the vehicle to see if [it] was possibly stolen or if [it] had been abandoned." (*Id.*). He was subsequently advised by his dispatcher to "remain on the scene until Arlington County Police [were] notified." (*Id.* at 194). The Cherokee was towed to the Arlington County Police Department at 2:00 a.m. on July 17.

On July 19, Officer Robert Stewart of the Metropolitan Police Department attempted to effect a traffic stop of Petitioner's Chevrolet Caprice heading southbound on 17th Street in the District of Columbia. When he activated his emergency signal, "[t]he vehicle sped up" and "made numerous traffic violations." (T. 1/16/03, at 40). Officer Stewart pursued and observed the Caprice "accelerate into the intersection of 17th and Potomac and collide[] with a total of . . . three vehicles." (*Id.* at 41). After the crash, Petitioner "somehow climb[ed] over the driver's seat, exit[ed] the rear door and attempt[ed] to flee." (*Id.*). Along with other officers, Officer Stewart gave chase on foot, tackled Petitioner, and placed him under arrest.

12

Meanwhile, evidence derived from the investigations of the carjacking and bank robberies accumulated.  Police learned that a pager recovered from the scene of the carjacking belonged to a woman named Syreeta Smith.  Ms. Smith testified that she was working as a prostitute in the District of Columbia on July 8, 2001, when a man robbed her, another prostitute, and two customers at gunpoint, taking her pager and money in the process.  She met with Detective Michael Olds of the Prince George's County Police Department on July 18 and identified Petitioner from a photographic array as the robber.  (T. 1/10/03, at 172; T. 1/16/03, at 142).  On July 19, Ms. Harris, the branch manager of Columbia Bank, met with FBI Special Agent Michael Thompson and identified Petitioner from a photographic array as the man she saw shortly before and after the March 15 bank robbery.  (T. 1/7/03, at 45-46; T. 1/8/03, at 65).  On the same date, Officer Redden met with Detective Olds and identified Petitioner from photographs as one of the two men involved in the carjacking on June 13.  (T. 1/10/03, at 52-53).  Corporal Lisa Haring of the Arlington County Police Department executed a search warrant on the Cherokee, finding, *inter alia*, a receipt containing handwritten directions from a Safeway store where Petitioner was employed to another Safeway store adjacent to the Potomac Valley Bank branch that was robbed on June 21.  (T.

1/15/03, at 214; T. 1/16/03, at 81-82). Corporal Haring also recovered a bullet, two shell casings, and dye-stained money.[9]

Following Petitioner's arrest, an FBI forensic analyst determined that Petitioner was the major contributor of DNA found on the skull cap that was recovered shortly after the Bank of America robbery. (T. 1/09/03, at 42). Additionally, an FBI forensic examiner found Petitioner's fingerprints on the exterior driver's side of Officer Redden's vehicle. (T. 1/14/03, at 66-67).[10]

**B.   Procedural Background**

The jury began its deliberations on the morning of January 17, 2003, and returned a verdict that evening, finding Petitioner not guilty of the Potomac Valley Bank robbery and the use of a handgun in relation to that offense, but guilty on all other counts. Petitioner was sentenced on April 25, 2003, to an aggregate term of imprisonment of 112 years and ordered to pay restitution in the amount of $54,595.

On appeal, Petitioner argued (1) that he was denied access to evidence favorable to his defense, in violation of *Brady v.*

---

[9]   Corporal Barry Foust of the Arlington County Police Department previously testified that he recovered "cash that had red dye stains on it along with the dye pack" nearby the scene of the Chevy Chase robbery. (T. 1/15/03, at 184).

[10]   The jury also heard, *inter alia*, the testimony of a jailhouse informant regarding certain incriminating statements made by Petitioner while the two men were in pre-trial detention.

*Maryland*, 373 U.S. 83 (1963); (2) that the court erred by admitting in-court identifications by Ms. Burgos and Ms. Day; (3) that the bank robberies were improperly joined with the carjacking; (4) that the court erred in precluding him from introducing evidence related to a prior shooting involving a colleague of Officer Redden; and (5) that Officer Redden made false statements at trial and the government knowingly utilized his false testimony.   On January 11, 2005, the United States Court of Appeals for the Fourth Circuit issued an unpublished opinion affirming Petitioner's conviction.  *See United States v. Gilchrist*, 119 Fed.Appx. 485 (4th Cir. 2005) (per curiam).   It subsequently granted his petition for rehearing, however, "solely on the issue of whether he is entitled to be resentenced" in light of *United States v. Booker*, 543 U.S. 220 (2005), which was decided the day after the Fourth Circuit issued its initial opinion.  *United States v. Gilchrist*, 137 Fed.Appx. 520 (4th Cir. 2005).

On October 26, 2005, Petitioner's trial counsel, Douglas J. Wood, moved to withdraw his appearance.   At an attorney inquiry hearing, Petitioner's oral request for court-appointed counsel was granted, and Timothy J. Sullivan was appointed to represent Petitioner at resentencing.

On November 14, 2005, the court resentenced Petitioner to the same sentence previously imposed.   On appeal, Mr. Sullivan

submitted a brief under *Anders v. California*, 386 U.S. 738 (1967), asserting that there were no meritorious claims, but raising an issue as to whether "the district court erred by allowing [Petitioner] to be tried and sentenced on an indictment that failed to allege specific violations of [§ 924(c)(1)(C)]." *United States v. Gilchrist*, 204 Fed.Appx. 258, 259 (4th Cir. 2006). The Fourth Circuit affirmed, finding that it had "previously rejected this argument." *Id.* (citing *United States v. Robinson*, 404 F.3d 850, 862 (4th Cir. 2005); *Harris v. United States*, 536 U.S. 545 (2002)). The Supreme Court denied *certiorari* on May 14, 2007. *See Gilchrist v. United States*, 550 U.S. 945 (2007).

Petitioner timely filed the pending motion to vacate, set aside, or correct his sentence on May 9, 2008, raising the following grounds:

> (1) his trial counsel rendered ineffective assistance because of an undisclosed conflict of interest;

> (2) his trial counsel rendered ineffective assistance by failing to communicate the terms of a plea offer and advise Petitioner to accept the offer;

> (3) his trial counsel rendered ineffective assistance by refusing to permit him to testify on his own behalf;

> (4) his trial counsel rendered ineffective assistance by failing to present expert testimony challenging the reliability of eyewitnesses identifications;

16

(5) counsel at his resentencing hearing rendered ineffective assistance by failing to make certain objections;

(6) his trial counsel rendered ineffective assistance by failing to investigate possible juror bias following an issue that arose at trial; and

(7) the court erred by sentencing him for three subsequent convictions under § 924(c)(1)(C) absent a finding by the jury that they were, in fact, subsequent convictions.

(ECF No. 76). Attached to his § 2255 petition was a motion for leave to conduct discovery and a motion for appointment of counsel. On July 25, 2008, Petitioner filed a "motion to amend and supplement pleadings pursuant to Fed.R.Civ.P. 15(a)(1)(A)." (ECF No. 79).

On September 29, 2008, the government filed a response, addressing Petitioner's motion to vacate, motion to amend, and motion for discovery. (ECF No. 82). Petitioner filed a reply on December 9, 2008. (ECF No. 85). He subsequently filed two additional discovery motions (ECF Nos. 93, 103); three motions to supplement the record with pertinent case law (ECF Nos. 95, 97, 111); and a second motion to amend (ECF No. 109).

## II. Motions to Amend

Petitioner filed motions to amend his § 2255 petition on July 25, 2008, and March 9, 2012. In the first motion, he seeks to add a claim that the grand jury testimony of Anthony Fox

17

"regarding jailhouse conversations . . . with [Petitioner] at Prince George['s] County [D]etention Center [was] false" and that "[t]he prosecutor knowingly presented false testimony and failed to correct erroneous statements." (ECF No. 79, at 2). In the second motion, he proposes a claim of ineffective assistance of appellate counsel related to Mr. Wood's failure to allege a Confrontation Clause violation on direct appeal. (ECF No. 109, at 4).

The Anti-Terrorism and Effective Death Penalty Act ("ADEPA") imposes a one-year statute of limitations on § 2255 motions brought by federal prisoners. To be timely, a federal prisoner must file any motion to vacate, set aside, or correct his sentence, including any amendments, within one year of the latest of the following dates:

> (1) the date on which the judgment of conviction becomes final;
>
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4) the date on which the facts supporting the claim or claims presented could have

18

been discovered through the exercise of due
diligence.

28 U.S.C. § 2255(f).

### A.   First Motion to Amend

As noted previously, the government responded to
Petitioner's § 2255 motion, his first motion to amend, and his
first motion for discovery in a single filing.  Petitioner
similarly addressed all three motions in his reply.  He appears
to concede in his reply papers that the limitations period
applying to the amended ground he proposes commenced on May 14,
2007, when the Supreme Court denied his petition for a writ of
*certiorari*, and that the proposed amendment, filed on July 25,
2008, was untimely by more than two months.  He nevertheless
contends that the claim should be considered on its merits
because it relates back to the initial filing.  (ECF No. 85, at
13).  He also appears to invoke the equitable tolling doctrine
insofar as he argues that he "used due diligence in bringing
[the proposed amendment] to the court['s] attention," but was
prevented from filing in a timely manner because the
correctional facility in which he was housed was "on
institutional lock-down status during the months of June and
July [2008]."  (ECF No. 79, at 1).

While the Rules Governing Section 2255 Proceedings do not
specifically address the procedure for amendments, "courts have

typically applied Federal Rule of Civil Procedure 15 to the amendment of a § 2255 motion." *United States v. Pittman*, 209 F.3d 314, 317 (4th Cir. 2000). In some circumstances, Rule 15(c) will allow an amendment that is otherwise barred by the statute of limitations if the amendment relates back to the claims raised in the original filing. "Relation back is permitted when the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth . . . in the original pleading." *Id*. (internal marks omitted). As Petitioner himself recognizes, "relation back depend[s] on the existence of a common core of operative facts uniting the original and newly asserted claims." (ECF No. 85, at 13) (citing *Mayle v. Felix*, 545 U.S. 644 (2005)).

In support of his argument that the proposed amendment relates back to his initial filing, Petitioner points to the discovery motion that he submitted along with his § 2255 petition, in which he requests production of documents regarding, *inter alia*, "the extent of Anthony Fox's involvement in pretrial proceeding[s]." (*Id*. at 13). This claim is not raised in the petition itself, however, and there is no reasonable view that such a claim arose from the "conduct, transaction, or occurrence set forth" in that motion. The fact that Petitioner requested discovery on an issue that he neglected to raise in the petition does not permit him to argue

20

later that an otherwise untimely proposed amendment relates back. There is simply no commonality between the ground proposed in the first motion to amend and the seven grounds set forth in the initial filing. Thus, Rule 15(c) is inapplicable.

The fact that Petitioner sought discovery regarding the grand jury proceedings on the same date that he filed his § 2255 petition undermines the basis of any equitable tolling argument. To justify equitable tolling, Petitioner must demonstrate "(1) extraordinary circumstances, (2) beyond his control or external to his own conduct, (3) that prevented him from filing on time." *United States v. Sosa*, 364 F.3d 507, 512 (4th Cir. 2004) (quotation marks omitted). To be timely, Petitioner's proposed amendment had to be filed by no later than May 14, 2008 – well before the alleged "lock-down status" at his correctional facility would have imposed any impediment to filing – and his discovery request clearly shows that he was aware of the issue at the time of the initial filing. To the extent that the untimely filing of his proposed amendment was based on an oversight or the *pro se* petitioner's lack of legal sophistication, such an explanation does not provide a valid basis for equitable tolling. *See, e.g., Cooper v. United States*, Nos. 2:06-cr-00046-1, 2:09-cv-01282, 2010 WL 3702662, at *6 (S.D.W.Va. Aug. 27, 2010) ("Ignorance of the law, including existence of AEDPA, [is] insufficient to warrant equitable

tolling") (citing *Marsh v. Soares*, 223 F.3d 1217, 1220 (10th Cir. 2000)).[11]

In sum, Petitioner's first motion to amend was untimely filed; the claim he seeks to add does not relate back to the § 2255 petition; and Petitioner cannot avail himself of the equitable tolling doctrine. Accordingly, his first motion to amend will be denied.

**B.   Second Motion to Amend**

In his second motion to amend, Petitioner seeks to add a claim that his appellate counsel rendered ineffective assistance. Specifically, Petitioner alleges that counsel failed to argue on direct appeal that a laboratory report finding that Petitioner was a major contributor of the DNA found on the skull cap recovered during the investigation of the Bank of America robbery was admitted into evidence through a witness who did not prepare the report, in violation of his rights under

---

[11] Even if this claim were not time-barred, it could not prevail because Petitioner failed to raise it prior to trial and a jury found him guilty beyond a reasonable doubt. *See Weichert v. United States*, 458 F.Supp.2d 57, 62 n. 2 (N.D.N.Y. 2006) ("Any claim by [coram nobis petitioner] arising out of allegedly perjurious testimony given by [a witness] to the grand jury must fail; as the Supreme Court noted in *United States v. Mechanik*, 475 U.S. 66, [73,] 106 S.Ct. 938, 89 L.Ed.2d 50 (1986), 'the petit jury's verdict rendered harmless any conceivable error in the charging decision that might have flowed from the violation.'"); *see also White v. United States*, Civ. No. WDQ-06-2875, Crim. No. WDQ-03-0375, 2007 WL 2461051, at *5 (D.Md. Aug. 24, 2007) (denying similar claim raised by § 2255 petitioner, citing *Mechanik*).

the Confrontation Clause of the Sixth Amendment.  (ECF No. 109, at 5).  Petitioner appears to argue that this amended ground is timely insofar as it relates to a right that "has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review."  28 U.S.C. § 2255(f)(3).  He acknowledges that "the foundation for the Sixth Amendment claim stated herein" derives from *Crawford v. Washington*, 541 U.S. 36 (2004), which was decided while his case was pending on appeal, but argues that "the claim as it relates to DNA evidence did not become ripe until [*Bullcoming v. New Mexico*, 564 U.S. ----, 131 S.Ct. 2705 (2011)] was announced" on June 23, 2011.  (ECF No. 109, at 3).  Additionally, the Supreme Court decided the factually analogous case of *Williams v. Illinois* after Petitioner filed the pending second motion to amend.  --- U.S. ----, 132 S.Ct. 2221 (2012).

In *Crawford*, 541 U.S. at 68, the Supreme Court held that the admission of "testimonial" hearsay violates the Confrontation Clause of the Sixth Amendment unless the declarant is unavailable and the defendant had "a prior opportunity for cross-examination."  Subsequently, in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 2532 (2009), the Court held that a forensic laboratory report created to serve as evidence in a criminal prosecution was testimonial for purposes of the Confrontation Clause; thus, absent a stipulation, the

prosecution could not introduce such a report into evidence without offering a witness competent to testify as to its accuracy. More recently, in *Bullcoming*, the Court considered whether the admission into evidence of a laboratory report certifying the results of a blood alcohol test through an analyst who was not the author of the report violated the Confrontation Clause. It held that the Confrontation Clause barred "the prosecution [from] introduc[ing] a forensic laboratory report containing a testimonial certification – made for the purpose of proving a particular fact – through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." *Bullcoming*, 131 S.Ct. at 2710. In *Bullcoming*, Justice Sotomayor observed in a concurring opinion that the Court was not presented with "a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence." *Id.* at 2722. This situation was presented in *Williams v. Illinois*, where the Supreme Court held that the prosecution does not violate the Confrontation Clause where a testifying expert relies on a laboratory certificate of DNA analysis for the basis of an opinion, but does not offer the certificate itself in evidence. --- U.S. ----, 132 S.Ct. 2221 (2012).

To address Petitioner's argument, and assuming that *Williams* would not otherwise defeat his Sixth Amendment claim,[12] the threshold question here is whether *Bullcoming* and *Williams* announced new rules that apply retroactively on federal collateral review. *See* 28 U.S.C. § 2255(f)(3). The Supreme Court has made clear that *Crawford* announced a new rule, *see Whorton v. Bockting*, 549 U.S. 406, 417 (2007), and lower courts have disagreed as to whether *Melendez-Diaz* did as well, *see Walker v. Johnson*, No. 2:10CV548, 2011 WL 2119260, at *4 (E.D.Va. Apr. 19, 2011) (collecting cases). Still, courts have resoundingly rejected arguments that either of these precursors

---

[12] Under current law after *Williams*, the facts of this case indicate that five Justices of the Supreme Court would find that Mr. Giusti's testimony regarding the lab report did not violate Petitioner's confrontation rights, albeit by relying on different rationales. The four-Justice plurality in *Williams* likely would determine that Mr. Giusti's testimony concerning the report was offered not for the truth of the matter asserted in Ms. Donovan's report, but rather was offered for the distinct purpose of establishing Mr. Giusti's credibility as an expert under Fed.R.Evid. 703 and thus did not violate the Confrontation Clause. *See Williams*, 132 S.Ct. at 2233-41 (plurality op. of Alito, J.). Although Justice Thomas would likely conclude that the testimony was offered for its truth, he would nonetheless find it admissible because the report was not sworn to, certified, or otherwise imbued with the "solemnity" required for the statements to be deemed "'testimonial' for purposes of the Confrontation Clause." *Id.* at 2259-60 (Thomas, J. concurring). Thus, after the Supreme Court's ruling in *Williams*, Petitioner did not have a constitutional right to confront the author of the DNA report referenced by Mr. Giusti in his testimony. *See U.S. v. Pablo*, --- F.3d ---, 2012 WL 3860016, at *4-9 (10th Cir. Sept. 6, 2012) (concluding that admission of expert testimony relating to lab analyst's DNA report, which was not introduced into evidence, did not constitute plain error under *Williams*).

to *Bullcoming* and *Williams* could apply retroactively on collateral review.  As one court explained:

> To apply retroactively on federal collateral review, a new rule must forbid criminal punishment of certain individual acts – a standard that does not apply [here] – or the rule must be a "watershed" rule of criminal procedure. *Teague v. Lane*, 489 U.S. 288, 311 (1989).  In order to qualify as a watershed rule, a new rule "must be necessary to prevent 'an impermissibly large risk' of inaccurate conviction," and it "must 'alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding.'" *Whorton v. Brockting*, 549 U.S. 406, 418 (2007) (quoting *Schriro v. Summerlin*, 542 U.S. 348, 356 (2004)) (some internal quotation marks omitted).  The Court in *Whorton* found that the Confrontation Clause rule announced in *Crawford* did not meet either of these standards.  *Id.* at 418-21.  Even if [*Crawford*] "resulted in some net improvement in the accuracy of fact finding in criminal cases," the Court found that this improvement was not significant enough to amount to a watershed rule.  *Id.*  As *Melendez-Diaz* was an extension of the holding in *Crawford*, it likewise announced no watershed rule.  *See, e.g., Frankenberry v. Coleman*, No. 09-557, 2009 WL 3734140, at *5 (W.D.Pa. Nov. 6, 2009) ("[J]ust as *Crawford* does not apply retroactively to cases on collateral review, the asserted expansion of *Crawford* in *Melendez-Diaz* cannot apply retroactively. . . ."); *see also Vega v. Walsh*, No. 06-CV-6492, 2010 WL 1685819, at *10 (same); *Carillo v. United States*, No. 09-C-5796, 2009 WL 4675798, at *2 (N.D.Ill. Dec. 3, 2009) (same); *Larkin*, 2009 WL 2049991, at *2 (same).  Thus, even assuming, without deciding, that the rule in *Melendez-Diaz* is a "newly recognized" constitutional right, the rule does not apply retroactively and thus it does not

>               trigger   the   new   limitations   period   [the
>               petitioner]   claims   under   28   U.S.C.   §§
>               2244(d)(1)(C).

*Walker*, 2011 WL 2119260, at *4.

No federal appellate court has yet addressed whether *Bullcoming* or *Williams* established a "watershed" rule of criminal procedure, *see Vega v. Walsh*, 669 F.3d 123, 127 (2$^d$ Cir. 2012) (expressly not deciding "whether the rulings of *Melendez-Diaz* or *Bullcoming* apply retroactively"), but district courts have found that it does not. *See Benjamin v. Harrington*, 2012 WL 3248256, at *7 & n. 3 (C.D.Cal. June 27, 2012) (noting that *Bullcoming* and *Williams* did not create new rules, but are simply applications of the *Melendez-Diaz* and *Crawford* holdings to new sets of facts); *McMonagle v. Meyer*, No. CIV S-11-2115 GGH P., 2012 WL 273165, at *5 (E.D.Cal. Jan. 30, 2012) ("[T]he Supreme Court's decision in *Bullcoming* was not made retroactively applicable to cases on collateral review."). Indeed, it is difficult to imagine how it could. As another court recently explained:

>               *Bullcoming* and *Melendez-Diaz* represent even
>               less of a watershed moment in criminal
>               procedure than did *Crawford*. Where *Crawford*
>               completely redefined the confrontation
>               clause's requirements, *Melendez-Diaz* further
>               explored the characteristics of testimonial
>               statements under *Crawford* and, in turn,
>               *Bullcoming* expanded upon *Crawford*'s and
>               *Melendez-Diaz*'s rationales. *Bullcoming*, 131
>               S.Ct. at 2713-14, 2716-17; *Melendez-Diaz*,
>               129 S.Ct. at 2532. . . . Thus, the []

27

court's rationales barring retroactive
application of *Crawford* on collateral review
apply with greater force to *Crawford*'s
progeny, *Bullcoming* and *Melendez-Diaz*.

*In re Hacheney*, 269 P.3d 397, 404 (Wash.App.Div. 2 2012).

This reasoning is persuasive and will be applied here. Assuming, *arguendo*, that Petitioner had a constitutional right to confront the author of the DNA report reviewed by Mr. Giusti and that *Bullcoming* announced a rule "newly recognized by the Supreme Court," the rule was not "made retroactively applicable to cases on collateral review." 28 U.S.C. § 2255(f)(3). Thus, the limitations period applying to the proposed amendment commenced on the date Petitioner's judgment of conviction became final, not the date *Bullcoming* or *Williams* were decided. Accordingly, Petitioner's claim in this regard is time-barred and his second motion to amend will be denied.[13]

_____

[13] Again, Petitioner could not prevail on his ineffective assistance claim even if it were to be considered on the merits. His direct appeal was decided well over five years prior to *Bullcoming*. Mr. Wood, Petitioner's appellate counsel, could not have rendered ineffective assistance by failing to assert a right that had not been clearly established at that time. *See Kornahrens v. Evatt*, 66 F.3d 1350, 1360 (4th Cir. 1995) ("the case law is clear that an attorney's assistance is not rendered ineffective because he failed to anticipate a new rule of law"). As discussed, there is considerable debate on this "nuanced legal issue" even today, "particularly in light of the discordant 4-1-4 divide of opinions in *Williams*." *Pablo*, 2012 WL 3860016 at *9; *see also Williams*, 132 S.Ct. at 2245 (Breyer, J ., concurring) ("I believe the question [raised in this case is] difficult, important, and not squarely addressed other today or in our earlier opinions"); *id.* at 2277 (Kagan, J., dissenting) ("[The] clear rule [of our Confrontation Clause precedent] is

## III. Motions for Discovery

Petitioner seeks the following discovery related to his §
2255 petition: (1) interrogatories and production of documents
related to any plea offer made by the government, which would
"assist the petitioner in establishing a factual foundation in
support of [his] claims"; (2) documents "[i]dentifying and
ascertaining the extent of Anthony Fox's involvement in pretrial
proceedings," which allegedly would "reveal[] that the
government introduced testimony [before the grand jury] that it
knew or should have known was perjured"; (3) "[i]dentification
of any agreements made with government [w]itnesses," which is
"part of [the government's] continuing duty to disclose
favorable [evidence] to petitioner"; and (4) the deposition of
Paula Xinis, a former Assistant Federal Public Defender who
advised the court during the trial that she believed she
overheard jurors discussing the case during a lunch break. (ECF
No. 76, at 24).[14]

---

clear no longer . . . . What comes out of four Justices' desire
to limit *Melendez-Diaz* and *Bullcoming* in whatever way possible,
combined with one Justice's one-justice view of those holdings,
is — to be frank — who knows what . . . . [N]o one can tell in
what way or to what extent they are altered because no proposed
limitation commands the support of a majority . . . . Today's
plurality and concurring opinions [sow] uncertainty").

[14] While Petitioner has filed two other motions for
discovery, the second (ECF No. 93) is, in effect, a memorandum
in support of the initial motion, and the third (ECF No. 103)
merely elaborates on his request to depose Ms. Xinis.

Rule 6(a) of the Rules Governing § 2255 Proceedings provides that "[a] party may invoke the processes of discovery . . . if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise."  In *United States v. Roane*, 378 F.3d 382, 402-03 (4th Cir. 2004), the Fourth Circuit cited the following as the "proper standard" in considering such claims:

> The Supreme Court determined in *Harris v. Nelson*, 394 U.S. 286, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969), and its progeny, *Bracy v. Gramley*, 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997), that 'good cause' for discovery exists when a petition for habeas corpus establishes a prima facie case for relief.  *See Harris v. Nelson*, 394 U.S. at 290, 89 S.Ct. 1082.  Specifically, discovery is warranted, "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief."  *Bracy*, 520 U.S. at 908-09, 117 S.Ct. 1793 (citing *Harris*, 394 U.S. at 299-300, 89 S.Ct. 1082).

(quoting *Johnson v. Pruett*, No. 3:97CV895 (E.D.Va. May 3, 2000)).  In *Roane*, the court found no error where the district court "carefully considered each claim asserted . . . and assessed whether the Defendants had shown good cause for discovery."  *Id*. at 403.

Petitioner has failed to make the required showing here.  Initially, he seeks discovery regarding the existence of a plea offer, apparently in support of his claim that his trial counsel

Case 8:02-cr-00245-DKC   Document 116   Filed 09/27/12   Page 31 of 61

rendered ineffective assistance by failing to advise him of such
and recommend that he accept it.   The sum and substance of his
allegation that a plea was offered is as follows:

> Prior to the commencement of trial while in
> the detention area at the United States
> Courthouse in Greenbelt during discussions
> with counsel Douglas J. [W]ood, Esq.[,] I
> was asked by Mr. Wood, "You don't want to
> plead guilty[,"] I said "no[,"] and we
> continued to talk about how jury selection
> was done.   I interrupted and asked "why did
> you say that[,]" referring to the comment
> about pleading guilty and Mr. Wood said,
> "because the government made an offer[."]   I
> shook my head and we did not [discuss] any
> of the details of the offer or [its]
> feasibleness.

(ECF No. 76, at 5B/1).

As support for his belief that the government offered a
plea, Petitioner attaches a copy of a letter he received from
Mr. Wood, dated September 24, 2007, in which his trial counsel
advised, apparently in response to a request for materials from
his case file, "I will . . . check for a plea agreement, but I
do not recall one in writing."   (ECF No. 76, Ex. 7).   The
government insists that it only makes plea offers in writing and
that "there was no formal plea offer made to [Petitioner] or his
counsel" in this case.   (ECF No. 82, at 11).   Insofar as the
record does not support that a plea was ever offered, discovery
on the subject would be unlikely to serve any legitimate
purpose.   Petitioner's bare allegation regarding a conversation

with his trial counsel about a possible plea, without more, is insufficient to establish good cause for discovery. *See generally Higgs v. United States*, 711 F.Supp.2d 479, 506 (D.Md. 2010) (petitioner not permitted to embark on a "'fishing expedition' through the Government's files in search of evidence to support an imagined and fanciful claim").

Petitioner additionally seeks documents related to Anthony Fox's testimony in the grand jury. As noted, however, his claim in this regard is time-barred; thus, Petitioner cannot show good cause for discovery. Similarly, Petitioner cannot show good cause for discovery regarding the "[i]dentification of any agreements made with government [w]itnesses" (ECF No. 76, at 24), which appears to relate to a pre-trial disclosure made by the government to Mr. Wood that relocation expenses were paid for Mr. Fox. (ECF No. 79, at 2 n. 3 and attachment). To the extent that he cites the government's "continuing duty to disclose favorable [evidence]" (*id.*), he appears to seek documents related to an unspecified *Brady* violation. Because no such claim has been raised, good cause for discovery cannot be established.

Finally, Petitioner seeks to depose Ms. Xinis, a former Assistant Federal Public Defender who advised the court during Petitioner's trial of an out-of-court conversation she overheard involving four jurors that she believed related to the case on

trial.  This issue was thoroughly explored at trial.  The jurors involved were identified and independently questioned by the court and counsel for both parties.  Each of the four jurors insisted that no improper discussion had occurred and that no premature conclusions regarding Petitioner's guilt had been drawn.  Ms. Xinis' testimony at a deposition as to what she thought she heard would be unlikely to add anything substantive in light of the record made by the jurors themselves.  Thus, Petitioner has failed to show good cause for discovery in this regard.

In sum, Petitioner has not raised specific allegations showing reason to believe that he would be entitled to relief with further development of the facts.  Accordingly, his discovery motions will be denied.

## IV.  Motion for Appointment of Counsel

Petitioner asks that counsel be appointed to represent him in connection with his § 2255 motion in order to assist him with "fil[ing] ex-parte motions[,] . . . obtain[ing] investigators and experts[, and] gaug[ing] whether an interview with Paula Xinis or others involved would be of benefit."  (ECF No. 76, at 26).  Pursuant to 18 U.S.C. § 3006A(a)(2)(B), a petitioner seeking relief under § 2255 may be appointed counsel "[w]henever the . . . court determines that the interests of justice so require[.]"

Here, neither discovery nor a hearing is necessary, *see* Rules Governing Section 2255 Proceedings for the United States District Courts R. 6(a), 8(c) (2010) (counsel should be appointed when a hearing or discovery is required), and Petitioner has adequately set forth and supported his grounds for relief.  Under these circumstances, the interests of justice do not require appointment of counsel.  Accordingly, this motion will be denied.

**V.    Motion to Vacate, Set Aside, or Correct Sentence**

     **A.    Standard of Review**

Title 28, § 2255, requires a petitioner to prove by a preponderance of the evidence that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]"  28 U.S.C. § 2255(a).  A *pro se* petitioner, such as Mr. Gilchrist, is, of course, entitled to have his arguments reviewed with appropriate consideration.  *See Gordon v. Leeke*, 574 F.2d 1147, 1151-52 (4th Cir. 1978).  Where, however, a § 2255 petition, along with the files and records of the case, conclusively shows that the petitioner is not entitled to relief, a hearing on the motion is unnecessary and the claims raised therein may be dismissed summarily.  *See* 28 U.S.C. § 2255(b).

**B.    Procedural Default**

The ordinary rule is that "an error can be attacked on collateral review only if first challenged on direct review." *United States v. Harris*, 183 F.3d 313, 317 (4th Cir. 1999); *see also United States v. Sanders*, 247 F.3d 139, 144 (4th Cir. 2001) ("[h]abeas review is an extraordinary remedy and will not be allowed to do service for an appeal" (internal marks and citation omitted)).   Where a petitioner has procedurally defaulted a constitutional claim by failing to raise it on direct appeal, it may be raised for the first time in a § 2255 motion only upon a showing of either "cause and actual prejudice resulting from the errors of which he complains," or a demonstration that "a miscarriage of justice would result from the refusal of the court to entertain the collateral attack." *United States v. Mikalajunas*, 186 F.3d 490, 492-93 (4th Cir. 1999).

A showing of cause for a procedural default "must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel." *Mikalajunas*, 186 F.3d at 493.   To establish actual prejudice, the petitioner must show that the error worked to his "actual and substantial disadvantage," rather than merely creating a possibility of prejudice.   *Murray v. Carrier*, 477 U.S. 478, 494 (1986).   A petitioner demonstrates that a miscarriage of justice

would result if the court does not consider a procedurally defaulted claim by showing "actual innocence by clear and convincing evidence" – in other words, "actual factual innocence of the offense of conviction, *i.e.*, that petitioner did not commit the crime of which he was convicted[.]" *Mikalajunas*, 186 F.3d at 494.

Here, Petitioner was required to raise the seventh ground set forth in his § 2255 motion – *i.e.*, alleging sentencing error regarding three of his convictions for use of a handgun during the commission of a crime of violence, under 18 U.S.C. § 924(c)(1)(C) – on direct appeal.  To the extent that he did not, he bears the burden of showing either cause and actual prejudice resulting from the alleged error or that he is actually innocent of the crimes for which he stands convicted.  He has made no such showing here.

It appears, moreover, that the Fourth Circuit addressed this precise issue in the appeal from Petitioner's resentencing proceeding.  In his second appeal, Petitioner argued that "the district court erred by allowing [him] to be tried and sentenced on an indictment that failed to allege specific violations of [§ 924(c)(1)(C)]." *Gilchrist*, 204 Fed.Appx. at 259.  The court rejected that argument, citing, *inter alia*, *Harris*, 536 U.S. 545, as "holding that *Apprendi v. New Jersey*, 550 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the precursor case to

36

*Booker*, applies to facts that increase the sentence beyond the statutory maximum, but not to facts that merely increase the mandatory minimum sentence." *Id*. Absent an intervening change in the substantive law, a "petitioner may not, through a habeas petition, relitigate an issue previously rejected on direct appeal." *Johnson v. United States*, No[s]. Civ. PJM-08-2623, Crim. PJM 02-0178, 2010 WL 2573212, at *2 (D.Md. June 22, 2010) (citing *Boeckenhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir. 1976)). There has been no such change in the law here. *Id*. at *3. Thus, the seventh ground set forth in Petitioner's § 2255 motion is procedurally defaulted. *See United States v. Konsavich*, Criminal Action No. 5:05-CR-00019, Civil Action No. 5:08-CV-80100, 2009 WL 1759555, at *10 (W.D.Va. Jun. 19, 2009) ("claims [that] were either not raised on direct appeal or raised and decided by the Court of Appeals . . . are procedurally defaulted").

### C.   Ineffective Assistance of Counsel

What remains, then, are Petitioner's six claims of ineffective assistance of his trial and resentencing counsel. These claims are governed by the well-settled standard adopted by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). Under the *Strickland* standard, the petitioner must show both that the performance of his attorneys fell below an objective standard of reasonableness and that he suffered actual

prejudice.  *See Strickland*, 466 U.S. at 687.  To demonstrate actual prejudice, he must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Id*. at 694.

In applying *Strickland*, there exists a strong presumption that counsel's conduct falls within a wide range of reasonably professional conduct, and courts must be highly deferential in scrutinizing counsel's performance.  *See id.* at 688-89; *Bunch v. Thompson*, 949 F.2d 1354, 1363 (4th Cir. 1991).  Courts must judge the reasonableness of attorney conduct "as of the time their actions occurred, not the conduct's consequences after the fact."  *Frye v. Lee*, 235 F.3d 897, 906 (4th Cir. 2000).  Furthermore, a determination need not be made concerning the attorney's performance if it is clear that no prejudice would have resulted even had the attorney's performance been deficient.  *See Strickland*, 466 U.S. at 697.

### 1.  Conflict of Interest

According to press clippings attached to Petitioner's motion papers, in or around the summer of 2000, Petitioner assaulted Prince George's County police officers on two separate occasions when they attempted (unsuccessfully) to arrest him for narcotics-related offenses.  He was subsequently charged in state court with two counts of first-degree assault.  On September 1, 2000, an undercover Prince George's County police

officer named Carlton Jones followed a car he believed was being driven by Petitioner from the District of Columbia to Fairfax County, Virginia.  At some point, a confrontation occurred and Officer Jones shot and killed the driver, who was later identified as Prince Jones.[15]  In or around February 2001, Mr. Jones' family members filed a wrongful death and survival action in state court against Prince George's County and individual officers associated with the shooting.[16]  In 2006, the Circuit Court for Prince George's County approved a structured settlement agreement pursuant to which Mr. Jones' child will be paid approximately $4.6 million over thirty-three years.  The attorney for the child in that action was Terrell N. Roberts III, the law partner of Petitioner's trial counsel, Mr. Wood. While the wrongful death suit was ongoing in state court, Mr.

---

[15] Carlton Jones will be referred to as "Officer Jones"; Prince Jones will be referred to as "Mr. Jones."

[16] The case was subsequently removed to this court.  Judge Williams dismissed the federal claims and remanded the state law claims.  *See Jones v. Prince George's County*, No. Civ.A. AW-04-1735, 2005 WL 1074353 (D.Md. Apr. 28, 2005).  A related suit was transferred to this court from the United States District Court for the District of Columbia, and summary judgment was ultimately granted in favor of the defendants in that case.  *See Jones v. Prince George's County, Md.*, 541 F.Supp.2d 761 (D.Md. 2008), *aff'd*, 355 Fed.Appx. 724 (4th Cir. 2009).  One or both of these cases was considered by Maryland appellate courts on two occasions.  *See Jones v. Prince George's County*, 378 Md. 98 (2003); *Jones v. Jones*, 172 Md.App. 429 (2007).  Notably, none of these decisions makes mention of Petitioner or alludes to the purported fact that Officer Jones believed he was following someone other than Prince Jones on the evening in question.

Wood represented Petitioner in multiple prosecutions in state and federal court related to the assault charges, Officer Redden's carjacking, and the bank robberies.

Petitioner asserts that he was never advised that Mr. Roberts represented Mr. Jones' child in the civil suit and that, if he had been, he "would have elected for conflict free counsel." (ECF No. 76, memo. at 2). According to Petitioner, "his interest diverged from [Mr. Wood's] and created a[n] actual conflict because [counsel] was beholden to the Jones [f]amily and had a significant financial stake in assuring [their] civil case was successful[.]" (*Id.* at 3). He alleges that Mr. Wood's "pecuniary interest in the future settlement . . . caused [him] to avoid trial tactics which were beneficial to [Petitioner]." (*Id.*).

To succeed in establishing ineffective assistance based on an actual conflict of interest, a petitioner must prove that counsel took action, or declined to act, on behalf of one client and that the action or inaction adversely affected the defense of the other. *See United States v. Tatum*, 943 F.2d 370, 376 (4th Cir. 1991). An attorney's performance is adversely affected when the attorney actively pursued conflicting interests. *See Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). Because joint representation does not amount to a *per se* constitutional violation, merely demonstrating a potential conflict of interest

will not suffice.  *See Gilbert v. Moore*, 134 F.3d 642, 652 (4th Cir.) (*en banc*), *cert. denied*, 525 U.S. 840 (1998).   The inquiries into whether an actual conflict of interest existed and whether it adversely affected the representation "are fact-based inquiries that often will be intertwined[.]"   *United States v. Swartz*, 975 F.2d 1042, 1048 (4th Cir. 1992).

Pursuant to Local Rule 704, the court applies the Maryland Rules of Professional Conduct ("MRPC") as adopted by the Court of Appeals of Maryland.   MRPC 1.7(a) provides, absent certain exceptions, that "a lawyer shall not represent a client if the representation involves a conflict of interest."   Pursuant to MRPC 1.10(a), "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by [Rule 1.7][.]"   Here, Mr. Wood and Mr. Roberts were partners in the same law firm at the time Mr. Wood represented Petitioner and Mr. Roberts represented Mr. Jones' daughter.   Thus, there is at least the possibility of a conflict stemming from the concomitant representations by the law partners.

Petitioner, however, has not shown anything more than a potential conflict of interest.   The newspaper reports provided by Petitioner reflect only a tangential relationship between him and the facts underlying the civil suit.   They do not support that he was in any way involved in the events of September 1,

41

2000, nor do the opinions of multiple courts related to these events hint of Petitioner's involvement.  His suggestion to the contrary is unsupported by any evidence outside of his motion papers.  Thus, he has failed to demonstrate an actual conflict of interest.

Even assuming there was an actual conflict, Petitioner has shown no adverse effect resulting from it.  To show adverse effect, Petitioner must satisfy a three-part test:

> First, the petitioner must identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued.  Second, the petitioner must show that the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision.  In the language of *Tatum*, the petitioner must show that the alternative strategy or tactic was "clearly suggested by the circumstances." *Tatum*, 943 F.2d at 376.  Finally, the petitioner must establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict.

*Mickens v. Taylor*, 240 F.3d 348, 361 (4th Cir. 2001).  Here, Petitioner argues that "[t]he adverse performance requirement is evidenced in trial counsel['s] failure to allow [him] to testify in his own behalf because of counsel['s] desire to avoid cross-examination or response from [Petitioner] that would harm the other client."  (ECF No. 76, memo. at 3-4).  He asserts that he "spoke freely of [his] involvement in the death of [Prince Jones]" with Mr. Wood over the course of his representation (*id*.

at 5A/2), and that he had unspecified "damaging information" that would have jeopardized the success of the civil case if it had been revealed at Petitioner's trial (*id.* at memo. p. 4).[17]

Petitioner's suggestion that his trial counsel refused to allow him to testify in order to prevent unspecified information from coming to light appears to be mere speculation. In any event, it is highly unlikely that Petitioner taking the witness stand would have constituted a "plausible defense strategy or tactic that his defense counsel might have pursued." *Mickens*, 240 F.3d at 361. To be certain, if Petitioner had testified, a great deal of information would likely have come to light – Petitioner's criminal history, for example, would have been fair game on cross-examination – but the events surrounding the Jones shooting would have been wholly irrelevant. For that reason, the government moved *in limine*, prior to trial, to preclude any reference to "Carlton Jones, Prince Jones or any shooting where Mr. Gilchrist was a possible target or subject . . . , not only in opening statement, but throughout the entire course of this trial." (T. 1/7/03, at 15). Mr. Wood, however, repeatedly

---

[17] In his reply papers, Petitioner requests appointment of counsel "to assist him in preserving his [F]ifth [A]mendment right against self-incrimination before further divulging the contents of attorney/client conversations that may inculpate petitioner regarding his involvement and knowledge of [the] Prince Jones killing." (ECF No. 85, at 4). His invocation of the Fifth Amendment begs the question of how the risk of self-incrimination would not have similarly limited his testimony at trial.

sought to introduce evidence that the Prince George's County Police Department targeted Petitioner in its investigation of these crimes based on prior contacts with him. At a bench conference during his cross-examination of Officer Redden, he specifically made a proffer about Officer Jones: "Carlton Jones is a member of the Narcotics Department, and he was involved in the earlier events when [Petitioner] had tried to assault members of Narcotics. And the connection between Carlton Jones, the earlier assaults, would make it more likely that [Officer Redden] actually did know [Petitioner]." (T. 1/10/03, at 86). The court refused to permit any questioning regarding the Jones incident or any other "notoriety about [Petitioner] unless there's some indication that this witness had exposure to it." (*Id.* at 88). Mr. Wood questioned Officer Redden extensively regarding any knowledge of Petitioner or his reputation prior to the carjacking, but the witness denied having any such knowledge. On appeal, Mr. Wood specifically challenged the court's ruling "that [Officer] Redden could not be questioned about the Prince Jones incident unless [he] first acknowledged that he had heard of [Petitioner] before the date of the carjacking." *See* Appellant's brief, 2004 WL 5243180. While this argument was unsuccessful, the fact that Mr. Wood raised it significantly undermines Petitioner's suggestion that his

counsel sought to avoid testimony about the Prince Jones shooting. Indeed, the record supports the opposite conclusion.

In sum, Petitioner has failed to show that Mr. Wood's representation of him in the underlying criminal case and his law partner's concomitant representation of Mr. Jones' daughter in the civil suit was anything more than a "mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171 (2002). Even if he could show that his counsel represented competing interests, he cannot demonstrate that the conflict adversely affected counsel's performance. Accordingly, Petitioner's ineffective assistance claim based on an alleged conflict of interest cannot prevail.[18]

### 2.   Failure to Communicate Plea Offer

As noted previously, Petitioner asserts that he and Mr. Wood had a conversation on the morning of jury selection during which counsel briefly confirmed that he did not wish to plead

---

[18] Alternatively, Petitioner suggests that Mr. Wood's alleged failure to communicate the details of a plea offer was somehow motivated by the same conflict. Specifically, he argues, "[i]n this case relaying a possible plea offer and the possibility of an agreement to testify for the prosecution about his knowledge of Prince C. Jones for [a] lesser charge or a favorable sentencing recommendation would be acceptable." (ECF No. 76, memo. at 4). It is not at all clear what this means, but he appears to fault his trial counsel for failing to secure a plea in exchange for his testimony for the defense at the civil trial. This speculative argument overlooks that the federal government and Prince George's County are distinct entities and that the prosecution would presumably have had no interest in the outcome of the state court civil litigation.

guilty and mentioned that a plea had been offered. Petitioner now contends that his counsel rendered ineffective assistance by "fail[ing] to relay [the] plea offered," by "fail[ing] to advise petitioner correctly of his possible sentencing exposure," and by "giving a[n] inaccurate []representation that petitioner was 'facing 5 years on the § 924(c) convictions[,]' which greatly affected the complexion of any plea discussion." (ECF No. 76, memo. at 6-7). Had counsel done these things, Petitioner asserts, he would have accepted a plea.

The Supreme Court's recent decision in *Missouri v. Frye*, 132 S.Ct. 1399 (2012), is instructive on this issue. That case involved a state court prosecution of a defendant, Mr. Frye, for driving with a revoked license. Prior to trial, the prosecution sent a letter to defense counsel offering the defendant a choice of two pleas, one of which would have allowed Frye to plead to a misdemeanor offense carrying a maximum term of imprisonment of one year. It was undisputed that Frye's attorney never advised him of the plea offer and that it subsequently expired. Frye eventually entered a guilty plea, without the benefit of a plea agreement, and was sentenced to a three-year term of imprisonment.

Before the Supreme Court, Frye argued that he would have accepted the misdemeanor plea if he had been informed of it and that his trial counsel rendered ineffective assistance by

failing to communicate the offer.  The Court initially observed that a defendant's Sixth Amendment right to effective assistance of counsel applies during the plea negotiation process, and reaffirmed that "claims of ineffective assistance of counsel in the plea bargain context are governed by the two-part test set forth in *Strickland*."  *Frye*, 132 S.Ct. at 1405 (citing *Hill v. Lockhart*, 474 U.S. 52, 57 (1985)).  The Court held that, "as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused."  *Id.* at 1408. Thus, when Frye's counsel "allowed the offer to expire without advising the defendant or allowing him to consider it, defense counsel did not render the effective assistance the Constitution requires."  *Id.*  In other words, the failure to communicate the plea offer constituted deficient performance under *Strickland*. As to the prejudice prong, the Court explained that "defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel" and that "the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law."  *Id.* at 1409.[19]

---

[19] In the companion case to *Frye* – *Lafler v. Cooper*, 132 S.Ct. 1376 (2012) – the Court considered facts in which a plea

Petitioner cannot establish his ineffective assistance claim in this regard because the record reflects that a formal plea offer was never made. The only evidence provided by Petitioner is the September 24, 2007, letter from Mr. Wood, which indicates counsel's belief that there was no "plea agreement . . . in writing." (ECF No. 76, Ex. 7). The government asserts that it only makes formal plea offers in writing and that no such offer was made in this case. (ECF No. 82, at 11). Petitioner clearly cannot establish the deficient performance prong under *Strickland* without showing that a formal plea offer was made. *See Johnson v. United States*, --- F.Supp.2d ----, 2012 WL 992109, at *91 (N.D.Iowa Mar. 22, 2012) ("Logic dictates . . . [that] the petitioner must begin by proving that a plea agreement was formally offered by the government" (emphasis removed)); *see also Ramos v. United States*, Cr. No. 01-10369-PBS, 2012 WL 1109081, at *5 (D.Mass. Mar. 30, 2012) (denying habeas relief, finding "[t]he

---

offer was communicated to the defendant, but defense counsel erroneously encouraged him not to accept it because the prosecution would be unable to establish an essential element of the crime at trial. Under those circumstances, the Court similarly held that defendants seeking habeas relief "must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court . . . , that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Lafler*, 132 S.Ct. at 1385.

circumstances in *Frye* and *Lafler* are factually distinguishable because the government did not offer [the petitioner] a plea agreement."). Because the record supports that no formal offer was made here, Petitioner's claim must fail. *See Kingsberry v. United States*, 202 F.3d 1030, 1032-33 (8th Cir. 2000) ("The record . . . is sufficient to show conclusively that a formal plea offer never materialized. The two parties necessarily privy to a plea offer and fundamental to resolution of this issue both deny the existence of a plea agreement offer.").

### 3. Denial of Right to Testify

Petitioner further contends that his trial counsel was ineffective because he refused to allow him to testify at trial. He asserts in a supporting declaration that if he had been permitted to do so, he would have testified that: (1) Mr. Wood advised him not to speak to law enforcement officers on July 13, when he learned that he was wanted for questioning by the FBI; (2) he was fearful of police "because of prior threats on [his] life . . . and [to] other family members"; (3) on the date of his arrest, he fled from police because he "thought [he] would be killed by police on sight"; (4) that he painted his truck in July 2001 to avoid "constant harassment by police" related to the Prince Jones shooting; (5) that the Cherokee "had engine problems" and was parked at the home of an acquaintance during the relevant time period; and (6) that he never discussed his

49

case with the jailhouse informant who testified at trial.  (ECF
No. 76, Petitioner's declaration).[20]

A defendant in a criminal trial has a constitutional right
to testify on his own behalf.  *See Rock v. Arkansas*, 483 U.S.
44, 51-53 (1987); *see also* 18 U.S.C. § 3481 ("In trial of all
persons charged with . . . offenses against the United States .
. . the person charged shall, at his own request, be a competent
witness").  While "it is the defendant who retains the ultimate
authority to decide whether or not to testify," *United States v.
McMeans*, 927 F.2d 162, 163 (4th Cir. 1991), "it is the attorney's
obligation to ensure that the defendant is informed of the right
to testify," *Gregory v. United States*, 109 F.Supp.2d 441, 448
(E.D.Va. 2000) (citing *Sexton v. French*, 163 F.3d 874, 882 (4th
Cir. 1998)).  A claim that counsel failed to fulfill that
obligation implicates the right to effective assistance of
counsel and may be evaluated under the test set forth in
*Strickland*.

Courts are particularly leery of these claims, however,
because "[i]t is simply too facile for a defendant, after being
convicted, to argue that he was not informed by counsel of his

---

[20]   The only mention in the record regarding whether
Petitioner would testify occurred at a bench conference near the
end of the government's case-in-chief.  The court inquired of
defense counsel as to whether it was a "fair assumption" that
Petitioner would not be testifying, to which Mr. Wood replied,
"Fair.  Very fair."  (T. 1/15/03, at 20).

right to testify." *Morrow v. United States*, Civil No. PJM 06-1801, Criminal No. PJM 03-081, 2007 WL 2225827, at *2 (D.Md. July 30, 2007) (citing *Underwood v. Clark*, 939 F.2d 473, 476 (7th Cir. 1991)).  Moreover, advice provided by counsel on whether to testify is "a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance." *Hutchins v. Garrison*, 724 F.2d 1425, 1436 (4th Cir. 1983). "Absent evidence of coercion, legal advice concerning the defendant's right to testify does not constitute [ineffective assistance of counsel]." *Carter v. Lee*, 283 F.3d 240, 249 (4th Cir. 2002) (quoting *Reyes-Vejerano v. United States*, 117 F.Supp.2d 103, 108-09 (D.P.R. 2000) (internal marks omitted)).

There is no indication in the trial record that Petitioner ever asserted a desire to testify on his own behalf, nor is there any hint that he was dissatisfied with his trial counsel for refusing to permit him to do so.  Even assuming that his attorney deprived him this right, as he now suggests, Petitioner has failed to show that any significant prejudice resulted.  The testimony he claims that he would have provided has little bearing, if any, on Petitioner's guilt or innocence of the bank robberies, carjacking, and handgun crimes with which he was charged.  Furthermore, the risks associated with exposing himself to the government's cross-examination would likely have substantially outweighed any marginal benefit he might have

gained, particularly in light of his criminal history.  Finally,
Petitioner's proposed testimony would have paled in comparison
to the overwhelming evidence of his guilt, which included
identifications by numerous witnesses, surveillance photographs
from each of the bank robberies, DNA and fingerprint evidence,
and shell casings and dye-stained money recovered from the Jeep
Cherokee.

In sum, assuming, *arguendo*, that Mr. Wood refused to allow
Petitioner to testify and that this refusal constituted
deficient performance under the first prong of *Strickland*,
Petitioner's claim nevertheless fails.  The second prong of
*Strickland* requires Petitioner to show that absent the alleged
error, the result of the trial would have been different.  The
testimony that Petitioner purportedly would have provided could
have had no significant effect on the outcome of his trial.
Thus, his showing under the *Strickland* prejudice requirement is
insufficient.  *See Gregory*, 109 F.Supp.2d at 448 (citing *Foster
v. Delo*, 39 F.3d 873, 877 (8th Cir. 1994); *United States v.
Tavares*, 100 F.3d 995, 998 (D.C. Cir. 1996)).

### 4.   Failure to Call Expert Witness

Petitioner next claims that his trial counsel rendered
ineffective assistance by failing to call an expert witness to
challenge the reliability of witness identifications.  In
Petitioner's view, this error was particularly egregious because

his "defense was one of misidentification contesting the
veracity of the government['s] witnesses." (ECF No. 76, at
5C/4).

As the United States District Court for the District of
South Carolina explained in *Glenn v. Ozmint*, Civil Action No.
8:08-3078-PMD-BHH, 2009 WL 2982682, at *18 (D.S.C. Sept. 11,
2009):

> Failure to call an eyewitness
> identification expert does not automatically
> prejudice a defendant; counsel can
> effectively present the mistaken identity
> defense in other ways. *See Ford v.
> Cockrell*, 315 F.Supp.2d 831, 853 (W.D.Tex.
> 2004) (no prejudice where counsel
> "persistently tried to cast the reliability
> of the identifications in doubt"); *see also
> United States v. Labansat*, 94 F.3d 527, 530
> (9th Cir. 1996) ("Any weaknesses in
> eyewitness identification testimony can
> ordinarily be revealed by counsel's careful
> cross-examination of the eyewitnesses")
> (citation omitted); *United States v. Harris*,
> 995 F.2d 532, 535 (4th Cir. 1993) (noting
> that "jurors using common sense and their
> faculties of observation can judge the
> credibility of an eyewitness identification,
> especially since deficiencies or
> inconsistencies in an eyewitness's testimony
> can be brought out with skillful cross-
> examination") (citation omitted). As long
> as the defendant has an adequate opportunity
> to cross-examine eyewitnesses, the exclusion
> of expert testimony on the reliability of
> eyewitness identification is not error.
> *Moore v. Tate*, 882 F.2d 1107, 1110-11 (6th
> Cir. 1989); *accord United States v. Hall*,
> 165 F.3d 1095, 1103 (7th Cir. 1999); [*Harris*,
> 995 F.2d at 533].

At Petitioner's trial, Mr. Wood vigorously challenged the reliability of eyewitness identifications on cross-examination, focusing on discrepancies between the trial testimony of witnesses and their prior reports to police regarding characteristics such as height, body size, complexion, and distinguishing marks. Moreover, the court gave a lengthy instruction to the jury regarding the reliability of identification evidence. The jury was specifically advised that "identification of the defendant as the perpetrator of the crime" was "[o]ne of the most important issues in the case." (T. 1/16/03, jury instructions, at 12). The court suggested the jurors should consider such questions as: "Did the witness have the ability to see the offender at the time of the offense? Has the witness' identification of the defendant as the offender been influenced in any way? Has the identification been unfairly suggested by events that occurred since the time of the offense? [and] Is the witness' recollection accurate?" (*Id.* at 12-13). *See Switzer v. Hannigan*, 45 F.Supp.2d 873, 878 (D.Kan. 1999) (finding that a "cautionary instruction . . . which underscored the problems associated with identification" mitigated any prejudice inuring from the failure "to call an expert in eyewitness identification"). Where, as here, a petitioner "does no more than argue that other forms of presentation might have been more influential at trial, . . .

[his] claims are insufficient to undermine confidence in the process afforded him during trial." *Spirko v. Anderson*, No. 3: 95CV7209, 2000 WL 1278383, at *23 (N.D.Ohio July 11, 2000) (quoting *Switzer*, 45 F.Supp.2d at 879) (internal marks omitted).

Considering that defense counsel took full advantage of opportunities for cross-examination, that the court instructed the jury as to the reliability of identification evidence, and that assessing such reliability is typically within the ken of the average juror, Petitioner has failed to overcome the strong presumption that his counsel's performance fell within a wide range of reasonably professional conduct. *See Strickland*, 466 U.S. at 688-89. Accordingly, this claim must fail.

### 5. Failure to Object at Resentencing

Petitioner faults his counsel at the resentencing proceeding, Timothy J. Sullivan, for failing to "(1) introduce evidence of petitioner's background; (2) present testimony from friends, family, and co-workers of good character; [and] (3) present evidence of extensive psychological records from youth throughout adulthood." (ECF No. 76, memo. at 15). He further contends that Mr. Sullivan rendered ineffective assistance by failing "to object to the trial court['s] mistaken belief that it did not have the power to consider all the factors of § 3553(a) anew on *Booker* remand" and by failing to "lodge a[n] objection based on a Due Process violation of petitioner's

right[] to be meaningfully heard under the remedial framework of *Booker*." (ECF No. 76, at 5C/5).

The Fourth Circuit remanded Petitioner's case "solely on the issue of whether he is entitled to be resentenced" in light of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), which was decided shortly after the initial opinion. *Gilchrist*, 137 Fed.Appx. at 520. In *Booker*, the Supreme Court held that mandatory sentencing guidelines violated the Sixth Amendment. As later explained by the Fourth Circuit:

> *Booker* does not in the end move any decision from judge to jury, or change the burden of persuasion. The remedial portion of *Booker* held that decisions about sentencing factors will continue to be made by judges, on the preponderance of the evidence, an approach that comports with the [S]ixth [A]mendment so long as the guideline system has some flexibility in application. As a practical matter, then, petitioners' sentences would be determined in the same way if they were sentenced today; the only change would be the degree of flexibility judges would enjoy in applying the guideline system.

*United States v. Morris*, 429 F.3d 65, 72 (4th Cir. 2005) (quoting *McReynolds v. United States*, 397 F.3d 479, 481 (7th Cir. 2005)). Accordingly, "[i]n the wake of *Booker*, . . . the discretion of a sentencing court is no longer bound by the range prescribed by the guidelines." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). The sentencing court, however, must still consult

the guidelines and consider them when determining an appropriate sentence. *Id.* (quoting *Booker*, 540 U.S. at 264).

At Petitioner's resentencing hearing, the court explained, "[w]e are here on a limited mandate to consider sentencing issues in light of [*Booker*]." (T. 11/14/05, at 7). The court "conclude[d] that, unless the Supreme Court or the Fourth Circuit tell me that the law is different, that [*Harris*, holding that the rule of *Apprendi* does not apply to facts that merely increase the mandatory minimum sentence)] remains good law, and that the statutory mandatory minimums which were adopted as the guidelines sentences are not affected by the recent Supreme Court decisions." (*Id.* at 8).[21]   After extensive legal argument by Mr. Sullivan, the court reiterated that "the only matters before the [c]ourt are those affected by the now advisory sentencing guidelines . . . [and] I conclude that the mandatory minimums under the 924(c) counts are not subject to adjustment or alteration[.]" (*Id.* at 17).   With regard to the counts that did not require a mandatory minimum sentence, the court again recognized that "[t]he guidelines were binding on me at the time I originally sentenced [Petitioner]" and "[n]ow, they are but one of the factors that the [c]ourt takes into account in fashioning a reasonable sentence." (*Id.* at 18-19).   In light of

---

[21] As noted previously, Mr. Sullivan specifically challenged this conclusion on appeal, and the Fourth Circuit affirmed. *See Gilchrist*, 204 Fed.Appx. at 259.

Petitioner's "background and status as a career offender," the court elected to impose the same "30-year sentence for all" of the non-mandatory offenses, explaining that "[w]hether there are underlying emotional or mental health issues cannot excuse the behavior either in this offense or the criminal history." (*Id.* at 19-20).

The record reflects that Petitioner was afforded exemplary representation at his resentencing proceeding. Mr. Sullivan filed a sentencing memorandum, alleging that the court erred by allowing Petitioner to be tried and sentenced on an indictment that failed to allege specific violations of 18 U.S.C. § 924(c); indeed, he raised the same issue before the Fourth Circuit. He presented extensive and nuanced legal argument on the evolving state of the law following *Booker*. Petitioner's contention that his counsel should have presented mitigating evidence or that he should have objected to the court's "mistaken belief" that it was not authorized to conduct a full resentencing is belied by the record and ignores the court's repeated recognition of the limited issues before it under the Fourth Circuit's mandate. There is simply no suggestion that counsel's performance was in any way deficient or that any of the alleged errors could have altered the outcome of the resentencing proceeding. Petitioner's argument to the contrary is wholly meritless.

**6.   Failure to Investigate**

As noted previously, on the next-to-last day of trial, the court received a letter from Paula Xinis, who was at that time an Assistant Federal Public Defender.  In the letter, Ms. Xinis related that she had "heard snippets" of a conversation, primarily about the defendant's courtroom attire, between "four female jurors" having lunch in the courthouse cafeteria.  In response, the court immediately brought the note to the attention of counsel for both sides.  The parties agreed to interview the female jurors and the first four that were questioned were identified as the jurors referenced in the letter.  The jurors independently recalled having a conversation about the attire of the attorneys, not the defendant, and each insisted that no inappropriate discussion had occurred and that they had not prematurely drawn a conclusion regarding Petitioner's guilt or innocence.  Afterward, the court concluded:

> From what we've been able to ascertain, first of all, they all four looked very concerned and very nervous when I asked them the questions.  I have no reason to think that they are deliberately lying or not recalling, so I don't know what Ms. Xinis heard and she took it to mean, if anything, but I am not persuaded that these four jurors had any inappropriate discussion among themselves or that any of these four have, in fact, made up their mind.  They were emphatic, some of them more so than others, but all of them clear that they have not predetermined this case at all.

(T. 1/15/03, at 177-78).   Mr. Wood asked and was granted permission to speak with Ms. Xinis about the incident (*id*. at 177), but there is no record as to whether he did.

Petitioner now suggests that Mr. Wood did not interview Ms. Xinis and that his failure in this regard "could constitute deficient performance." (ECF No. 76, memo. at 20).   He does not, however, identify any prejudice that resulted from this purported omission, nor could he under these circumstances. Considering the extensive measures that were taken to address concerns of juror misconduct, there is, frankly, no likelihood that interviewing Ms. Xinis regarding what she believed she heard could have changed the end result.   Accordingly, Petitioner's claim that his trial counsel rendered ineffective assistance by failing to interview her – if, in fact, he did not – cannot prevail.

## VI.   Conclusion

For the foregoing reasons, Petitioner's motions to amend, for discovery, for appointment of counsel, and to vacate, set aside, or correct his sentence will be denied.

Pursuant to Rule 11(a) of the Rules Governing Proceedings Under 28 U.S.C. §§ 2254 or 2255, the court is also required to issue or deny a certificate of appealability when it enters a final order adverse to the applicant.   A certificate of appealability is a "jurisdictional prerequisite" to an appeal

from the court's earlier order.  *United States v. Hadden*, 475 F.3d 652, 659 (4th Cir. 2007).   It may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."   28 U .S.C. § 2253(c)(2).   Where a motion is denied on a procedural ground, a certificate of appealability will not issue unless the petitioner demonstrates both "(1) that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and (2) that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Rose v. Lee*, 252 F.3d 676, 684 (4th Cir. 2001) (internal quotation marks omitted).   Petitioner has not satisfied this standard.   The court will, therefore, decline to issue a certificate of appealability.

A separate order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge