IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA          :

                                   :

      v.                         : Criminal Case No. DKC 02-245

                                   :

DERRELL LAMONT GILCHRIST       :

                                   :

**MEMORANDUM OPINION AND ORDER**

Defendant Derrell Lamont Gilchrist filed two motions for a reduction in sentence under 18 U.S.C. § 3582(c)(1)(A) (compassionate release), (ECF Nos. 171, 180) with additional supplementation (ECF Nos. 189, 191, 198, 199, 201, 202, 203, 208). The motion was stayed for a period, and the Government responded. (ECF No. 194). Mr. Gilchrist replied. (ECF No. 197). He later also filed a motion under 18 U.S.C. § 3582(c)(2) to reduce sentence based on Amendment 821 (ECF No. 212).[1] For the following reasons, the motion to reduce sentence based on Amendment 821 will be denied, but the motions for compassionate release will be granted in part and denied in part.

---

[1] Pursuant to this court's Standing Order 2023-05, the Office of the Public Defender was appointed to determine whether the defendant is eligible to seek a reduced sentence based on the retroactive application of Amendment 821, and, if so, to present a motion to the court. The Public Defender reviewed this motion and, on January 28, 2025, indicated that it would not be supplementing it. (ECF No. 214).

Mr. Gilchrist was convicted and sentenced in 2003 for three separate armed bank robberies and accompanying charges.  He is serving an aggregate 112-year sentence, consisting of concurrent sentences of 300 months (25 years or lesser terms for two counts of armed bank robbery under 18 U.S.C. § 2113, conspiracy to commit armed bank robbery and carjacking under 18 U.S.C. § 371, carjacking under 18 U.S.C. § 2119, and felon in possession of a firearm under 18 U.S.C. § 922(g)), followed by consecutive sentences of five years for one armed bank robbery,[2] seven years for brandishing a firearm during a crime of violence under 18 U.S.C. § 924(c), and three consecutive terms of 25 years for three additional convictions for use of a firearm during a crime of violence.  The sentences add up as follows: 25 years (300 months) + 5 years (60 months) + 7 years (84 months) + 25 years (300 months) + 25 years (300 months) + 25 years (300 months) = 112 years (1344 months). His projected release date is June 2, 2097.

He was sentenced initially when the Sentencing Guidelines were mandatory.  After the Supreme Court decided *United States v.*

---

[2] The Sentencing Guideline range was 360 months to life for all the non § 924(c) firearm counts.  The maximum sentence allowable for armed bank robbery is 25 years, so the 5-year consecutive sentence for one bank robbery was imposed to reach the guideline minimum of 360 months.

*Booker*, 543 U.S. 220 (2005), he was resentenced under the advisory guidelines, but the sentences remained the same.

In his motions for compassionate release, Mr. Gilchrist cites sentencing disparity as the basis for consideration, and the "stacked" § 924(c) sentences, his "exemplary" efforts during 17 years of incarceration, his strong network of family members, and his remorse, as reasons to reduce his sentence to 25 years followed by 5 years of supervised release. (ECF No. 180). The Government opposes any relief, arguing that he is not eligible, and suggests that, in any event, a reduction should not go below 52 years. (ECF No. 194).

## I.    Background

The Fourth Circuit summarized the events underlying Mr. Gilchrist's convictions as follows:

> On March 15, 2001, Gilchrist, acting alone, masked and armed with a gun, entered a Columbia Bank branch located in Greenbelt, Maryland. Before Gilchrist entered the bank, the branch manager saw Gilchrist outside the bank without a mask. In the hallway outside the bank's lobby, Gilchrist, wearing a mask, encountered a customer who had already left the bank and demanded at gunpoint that the customer return to the bank and get on the floor. Gilchrist then demanded money by pointing the gun at tellers and customers. Gilchrist forcibly took federally insured United States currency. As he left the bank, Gilchrist stated, "Have a Merry Christmas."

Gilchrist was then observed by the branch manager and others fleeing across the parking lot and entering a black Jeep Cherokee.

In a photographic lineup, the Columbia Bank branch manager identified Gilchrist as the person she saw outside the bank on the date of the robbery. Bank surveillance photographs depicted the robber as short and stocky, which matched Gilchrist's physical build.

On April 25, 2001, Gilchrist robbed another bank, this time a Bank of America branch in Mitchellville, Maryland. Gilchrist, masked and armed with a gun, entered the bank and demanded money by pointing the gun at tellers and customers. Gilchrist forcibly took federally insured United States currency. As he left the bank, Gilchrist was heard saying, "Have a blessed day" and "Have a Merry Christmas."

Gilchrist was observed fleeing from the bank and running behind a shopping center located adjacent to the bank parking lot. A construction worker at the rear of the shopping center observed the robber fleeing and observed him get entangled in some bushes. A black nylon skull cap and a twenty-dollar bill were recovered in that same area of the bushes. A DNA comparison was done and Gilchrist was determined to be the major contributor of the DNA found on the skull cap.

Gilchrist's next heist occurred on June 15, 2001 at a Sun Trust Bank branch in Landover Hills, Maryland. Gilchrist and a taller, thinner African-American man were observed by Matilda Burgos, a bank customer, in the bank's parking lot. Burgos made eye contact with Gilchrist and watched Gilchrist and his accomplice walk to the bank door, where she observed one of the men pulling out a gun

4

before entering the bank. As described by witnesses and depicted in the bank surveillance photographs, both robbers displayed guns and wore bandannas covering their faces. They demanded and received United States currency. One of the robbers grabbed the keys to a customer's minivan. Both robbers fled in the stolen minivan, which was later recovered a short distance from the bank.

On July 13, 2002 [sic, should be 2001], Gilchrist and a taller, thinner African-American man approached Raymond Redden at 1441 McCormick Drive in Landover, Maryland and demanded his vehicle. Unbeknownst to Gilchrist and his accomplice, Redden was a Prince George's County police officer, recently assigned to the narcotics unit, and the vehicle was his undercover police vehicle. After Redden relinquished his keys by putting them on the front seat, Gilchrist told Redden to get on the ground because he was going to "cap him."

Gilchrist and Officer Redden then struggled for the gun. In the midst of the struggle, Gilchrist discharged his weapon but was unable to fire it again because Redden had his hand over the slide portion of the gun, thereby jamming the casing inside. During this struggle, Gilchrist instructed his accomplice to kill Redden. The accomplice tried to come closer to the two men, but was unable to get a clear shot. Gilchrist and his accomplice fled the scene in Redden's unmarked police vehicle.

A high-speed chase ensued. A short time later, Gilchrist and his accomplice abandoned the unmarked police vehicle and escaped on foot. However, the police were able to recover Officer Redden's vehicle. Fingerprints recovered on the driver's side exterior of the

vehicle were identified as belonging to Gilchrist. During a search of the vehicle, a pager not belonging to Redden was recovered.[1]

A photographic lineup was shown to Officer Redden, who identified Gilchrist as the shorter of the two carjackers and the one who tried to shoot him. Redden was also shown another photographic lineup and identified another photograph as depicting the tall, thin man who was Gilchrist's accomplice in the carjacking.

Less than two hours after the carjacking of Officer Redden, Gwendolyn Day was walking from a Seven-Eleven convenience store to a Chevy Chase Bank branch in Arlington, Virginia to join her sister who was inside the bank. As she crossed the parking lot, Day observed two men, one short and stocky, the other tall and thin, running toward the front of the bank. Nothing was covering their faces.

Moments later, when Day was inside the bank, the same short, stocky man, whom she identified in court as Gilchrist, and his tall, thin accomplice entered the bank. Both were wearing bandanna masks and carrying guns. Gilchrist demanded money by pointing the gun at tellers and customers, adding that he would "execute them" if they did not follow his orders. Gilchrist and his accomplice forcibly took federally insured United States currency.

While fleeing from the scene of the bank robbery in his Jeep Cherokee, Gilchrist failed to yield the right of way and nearly collided with another car. The other driver became angry and followed Gilchrist, who sped away. After obtaining the Cherokee's license-plate number, the driver who was following Gilchrist

returned to the Chevy Chase Bank branch and
provided the information to the police.

Later, Gilchrist abandoned his Jeep Cherokee
at a government office building in Washington,
D.C. The vehicle was found on July 17, 2001
and, inside the vehicle, the police recovered
dye-stained money, a bullet, and a bullet
casing. On July 19, 2001, Gilchrist was
apprehended, following a vehicular chase with
a Washington, D.C. police officer.

_____

[1] The pager recovered from Officer Redden's
vehicle belonged to Syretta Smith, a
prostitute whom Gilchrist robbed at gunpoint
on or about July 8, 2001. Smith was shown a
photographic lineup and identified Gilchrist
as the man who robbed her of her money and
pager. Smith also identified a second
photograph as the man who assisted Gilchrist
in robbing her.

*United States v. Gilchrist*, 119 F. App'x 485, 487–89 (4th Cir.),

*on reh'g in part*, 137 F. App'x 520 (4th Cir. 2005). At the time

of initial sentencing, Mr. Gilchrist qualified as a career

offender, placing him in Criminal History VI. One of the predicate

state court convictions has been vacated since his sentencing.

Without career offender designation, he was in a criminal history

category V and offense level 38. In either event, the guidelines

were 360 months to life.

7

## II.   Amendment 821

A defendant serving a sentence of imprisonment may petition the court for a reduction when he asserts that an applicable guideline range has since been lowered because of a retroactive amendment to the Sentencing Guidelines. 18 U.S.C. § 3582(c)(2); USSG 1B1.10(a)(1).  Excluded from relief, however, are cases where the relevant amendment "does not have the effect of lowering the defendant's applicable guideline range." USSG § 1B1.10(a)(2)(B).

> In considering whether and by how much to reduce a sentence under § 3582(c)(2), a district court follows a two-step inquiry. *Dillon v. United States*, 560 U.S. 817, 826, 130 S.Ct. 2683, 177 L.Ed.2d 271 (2010). The court first "follow[s] the Commission's instructions in § 1B1.10 to determine the prisoner's eligibility for a sentence modification and the extent of the reduction authorized." *Id*. at 827, 130 S.Ct. 2683. Specifically, § 1B1.10(b)(1) requires the court to "determine the amended guideline range that would have been applicable to the defendant if the amendment(s) to the guidelines listed in subsection (d) had been in effect at the time" of the defendant's initial sentencing. U.S.S.G. § 1B1.10(b)(1). At step two, a district court considers relevant sentencing factors to determine whether, in its discretion, a reduction "is warranted in whole or in part under the particular circumstances of the case." *Dillon*, 560 U.S. at 827, 130 S.Ct. 2683.

*United States v. Muldrow*, 844 F.3d 434, 438 (4th Cir. 2016) (footnote omitted).

This retroactive amendment to the Sentencing Guidelines made two changes to the criminal history guidelines.  As asserted by Mr. Gilchrist, Part A affects "status points" and provides that only defendants with seven or more criminal history points receive an additional point (and not two) for committing his offense while under any criminal-justice sentence.  The Presentence Report reflected twelve criminal history points, nine for prior convictions, two status points, and an additional point for committing an offense less than two years following his release from custody.[3]  He was designated a career offender with a Criminal History Category VI.

Mr. Gilchrist argues that the vacatur of one of his prior two point convictions not only eliminates career offender status, but also reduces his basic criminal history points to seven due to prior convictions.  Adding only one point for being under a criminal justice sentence (Amendment 821) and the one point for recency, he asserts that he would have nine criminal history points and only be in Criminal History Category IV.  The problem with this approach is that, as noted above, in determining whether a

---

[3]  Amendment 742 to the Sentencing Guidelines eliminated recency points under USSG § 4A1.1(e).  The Amendment took effect on November 1, 2010, and was NOT made retroactive.

retroactive change affects the overall guideline range, "the court shall substitute only the amendments listed in subsection (d) for the corresponding guideline provisions that were applied when the defendant was sentenced and shall leave all other guideline application decisions unaffected." USSG § 1B1.10(b)(1); *Dillon v. United States*, 560 U.S. 817, 831 (2010).

The later vacating of one of his prior convictions is not relevant.  This court already denied relief pursuant to 28 U.S.C. § 2255 from the post-sentencing invalidation due to lack of diligence.  (ECF No. 175).  Moreover, reducing the status points from two to one, and leaving all other guideline decisions unaffected, results in a total of eleven criminal history points, not nine as argued by Mr. Gilchrist.  He is still in Criminal History Category V and the career offender designation would also remain unchanged.  His guideline range is not changed by Amendment 821. His motion will be denied.

### III. Compassionate Release

> Generally, a district court can't modify a
> sentence once imposed. 18 U.S.C. § 3582(c).
> But the district court may reduce a sentence
> under § 3582(c)(1)(A)(i), which is commonly
> known     as     the     "compassionate-release

exception." *See United States v. Hargrove*, 30
F.4th 189, 194 (4ᵗʰ Cir. 2022).

A district court analyzes a compassionate
release motion in two steps. First, it
determines whether the defendant is eligible
for a sentence reduction. *See United States v.
Bond*, 56 F.4th 381, 383 (4ᵗʰ Cir. 2023). To be
eligible, the court must find that relief is
warranted because of "extraordinary and
compelling reasons" and "consistent with
applicable policy statements issued by the
Sentencing Commission." [*United States v.*]
*High*, 997 F.3d [181(4ᵗʰ Cir. 2021)]at 186; see
§ 3582(c)(1)(A)(i).   Second, the court
considers whether the 18 U.S.C. § 3553(a)
sentencing factors support relief. *Bond*, 56
F.4th at 384; § 3582(c)(1)(A)(i).

The Sentencing Commission issues policy
statements that describe what qualifies as an
extraordinary and compelling reason. 28 U.S.C.
§ 994(t).

*United States v. Moody*, 115 F.4th 304, 310–11 (4ᵗʰ Cir. 2024).

Effective November 1, 2023, the Policy Statements in USSG § 1B1.13

were updated, as described by another trial judge:

The controlling Guideline policy statement
identifies the following six categories of
circumstances that can support an
"extraordinary and compelling" finding:
    (1) Medical Circumstances of the
    Defendant ...
    (2) Age of the Defendant ...
    (3) Family Circumstances of the
    Defendant –
    ...
    (C) The incapacitation of the
    defendant's parent when the defendant

11

would be the only available caregiver
for the parent.
...
(4) Victim of Abuse [while in custody]
...
(5) Other Reasons – The defendant
presents any other circumstance or
combination of circumstances that, when
considered by themselves or together
with any of the reasons described in
paragraphs (1) through (4), are similar
in gravity to those described in
paragraphs (1) through (4).
(6) Unusually Long Sentence – If a
defendant received an unusually long
sentence and has served at least 10 years
of the term of imprisonment, a change in
the law (other than an amendment to the
Guidelines Manual that has not been made
retroactive) may be considered in
determining whether the defendant
presents an extraordinary and compelling
reason, but only where such change would
produce a gross disparity between the
sentence being served and the sentence
likely to be imposed at the time the
motion is filed, and after full
consideration of the defendant's
individualized circumstances.

U.S.S.G. § 1B1.13(b). Though not listed in
subsection (b), another subsection of the same
policy statement indicates that
rehabilitation while incarcerated is directly
relevant to the first step of the
compassionate release framework. See U.S.S.G.
§ 1B1.13(d) (indicating that although
rehabilitation "is not, by itself, an
extraordinary and compelling reason for
purposes of this policy statement,"
rehabilitation "may be considered in
combination with other circumstances in
determining whether and to what extent a

> reduction in the defendant's term of imprisonment is warranted"); see also U.S.S.G. Supp. to App. C, Amend. 814 (expressly stating that rehabilitation may be considered at the threshold step). The statutory requirement that a defendant demonstrate "extraordinary and compelling" reasons for relief is an "exceptionally high standard" that respects the principle of finality. *United States v. McCoy*, 981 F.3d 271, 288 (4th Cir. 2020). However, the principle of finality "must give way in certain individual cases" – extraordinary ones. *Id.* (citation omitted).

*United States v. Dire*, No. 2:10CR56, 2024 WL 4259871, at *2 (E.D. Va. Sept. 20, 2024).

Mr. Gilchrist is eligible for consideration.[4]   His three consecutive twenty-five year sentences for use of a firearm in crimes of violence pursuant to 18 U.S.C. § 924(c), mandatory at the time of his sentencing, would not be imposed today.  "In 2018, § 924(c) was amended such that the enhanced 25-year mandatory minimum sentence for second and subsequent § 924(c) convictions does not apply unless a defendant has a prior final § 924(c)

---

[4]   The Government's initial response was filed before the adoption of the new policy statements.  It conceded that, if *United States v. McCoy*, 981 F.3d 21 (4th Cir. 2020), applies, Mr. Gilchrist would meet the "extraordinary and compelling" threshold for compassionate release eligibility based on the length of his sentence due to the stacked § 924(c) sentences.  *McCoy* approved consideration of the statutory changes in "sentence stacking" in determining whether extraordinary and compelling circumstances existed.

conviction at the time he commits a § 924(c) offense.  First Step

Act of 2018, Pub. L. No. 115-391, § 403(a), 132 Stat. 5194, 5221-

22." *United States v. Dire*, No. 2:10CR56, 2024 WL 4259871, at *3

(E.D. Va. Sept. 20, 2024).  Thus, today, he would be subject to 15

years minimum for those three convictions, not 75 years.

Since his trial and initial sentencing, Mr. Gilchrist has

repeatedly and steadily challenged the convictions and sentences.

And, as pointed out by the Government, his early years in the

Bureau of Prisons involved disciplinary infractions.  At some

point, however, he began to show more maturity, studying and

ultimately earning a paralegal certificate, working on behalf of

other inmates, volunteering as a suicide watch companion, and

teaching adult education classes.  His positive impact on the lives

of other inmates is reflected in the letters included in his

papers.  Moreover, his own letters exhibit remorse for his criminal

conduct.

The seriousness of the offense conduct and his criminal

history cannot be denied.  He committed a series of armed robberies

over a few weeks, with multiple victims, brandishing a firearm in

several, as well as a very dangerous carjacking.

At the resentencing hearing, the court remarked that "I need

to decide what a reasonable sentence is for the counts that are

14

not covered by the 924(c) mandatory minimums . . . I simply, in my mind, am putting aside those [924(c) counts] and deciding what the sentence should be for the three counts of armed bank robbery, the count of conspiracy to commit bank robbery and carjacking, the actual carjacking, and the felon in possession of a firearm counts." (ECF No. 38 at 6, transcript at page 19.)  Since then, in *Dean v. United States*, 581 U.S. 62, 69 (2017), the Supreme Court held that a district court **may** consider the mandatory minimum when fashioning a sentence for the predicate offense.   Thus, Mr. Gilchrist has established extraordinary and compelling circumstances in the length of his overall sentence under USSG § 1B1.13(b)(6).  He has served more than ten years, and, considering the statutory changes regarding stacked § 924(c) charges, his sentence is grossly disparate to the one that would be imposed today, giving full consideration of his individualized circumstances.   He is eligible for a sentence reduction.   The question remains, however, under the § 3553(a) factors, what reduced sentence is appropriate.

His conduct while in prison and the changes in criminal law and sentencing jurisprudence counsel in favor of some sentence reduction.   The progress Mr. Gilchrist has made augurs well for the future and the goals of punishment, deterrence, and protecting

15

the public can be met with a reduced sentence.  It is appropriate
to reduce the sentence in this case to 37 years, consisting of
concurrent terms of 15 years (or less) on all of the underlying
offenses, and consecutive terms adding up to 22 years for the four
§ 924(c) convictions (7 + 5 + 5 + 5).  The mandatory consecutive
sentences for those four offenses are necessary to reflect the
decision of Congress concerning the seriousness of firearm use in
crimes of violence. Mr. Gilchrist argues that these current
mandatory minimums should not be used as a benchmark because he
likely would not have been charged with the four separate § 924(c)
offenses.  The court does not accept that assertion—Mr. Gilchrest
engaged in a weeks' long spree of armed robberies, and, if he
didn't face the four § 924(c) charges, then the court would likely
impose higher sentences for the underlying offenses, as it did
initially.  The guidelines for those offenses remain at 360 months
to life.  This sentence reduces the sentences for those offenses
to 15 years, or half of the previously imposed sentence.  The
underlying criminal activity was itself sufficiently aggravated to
justify the additional 15 years, and a total sentence of 37 years.

Accordingly, after considering the applicable factors
provided in 18 U.S.C. § 3553(a) and the applicable policy

statements issued by the Sentencing Commission, it is this 4th day of February, 2025, ORDERED that:

1.    The motion under 18 U.S.C. § 3582(c)(2) to reduce sentence based on Amendment 821 (ECF No. 212), BE, and the same hereby IS, DENIED;

2.    The motions for compassionate release (ECF Nos. 171, 180) BE, and the same hereby ARE, GRANTED IN PART and DENIED IN PART;

3.    The motion to seal (ECF No. 190) BE, and the same hereby IS, GRANTED, because the personal information contained in the submission should remain confidential except as recited herein;

4.    An amended judgment will be issued.  The previously imposed periods and conditions of supervised release are unchanged; and

5.    The Clerk IS DIRECTED to transmit a copy of this Order to Mr. Gilchrist and to counsel of record.


                                    _____/s/_____
                                    DEBORAH K. CHASANOW
                                    United States District Judge


                                    17